IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs October 5, 2010

## STATE OF TENNESSEE v. ALBERT DORSEY

**Direct Appeal from the Criminal Court for Shelby County**
**No. 08-01634     John T. Fowlkes, Jr., Judge**

_____

**No. W2010-00115-CCA-R3-CD  - Filed June 22, 2011**

_____

The Defendant-Appellant, Albert Dorsey, was convicted by a Shelby County jury of first degree premeditated murder and sentenced to life without the possibility of parole.  On appeal, Dorsey claims: (1) his conviction was not supported by sufficient evidence; (2) the aggravating circumstance used to impose his sentence of life without the possibility of parole was not supported by sufficient evidence; and (3) the trial court erred by admitting several photographs of the victim.  Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ALAN E. GLENN and J. C. MCLIN, JJ., joined.

Robert W. Jones, Chief Public Defender; Barry W. Kuhn, Assistant Public Defender, Memphis, Tennessee, for the Defendant-Appellant, Albert Dorsey.

Robert E. Cooper, Jr., Attorney General and Reporter; Cameron L. Hyder, Assistant Attorney General; William L. Gibbons, District Attorney General; Theresa McCusker and Rachel Newton, Assistant District Attorneys General, for the Appellee, State of Tennessee.

### OPINION

**Trial.**  On December 3, 2007, the partially clothed body of Dianna Franklin, the victim, was found near the railroad tracks at the dead-end of West Shelby Drive in Memphis, Tennessee.  There were numerous cuts and bruises to the victim's face, two stabs wounds to her chest area, and thirty-seven incised wounds or incised wound complexes all about the victim's body.  The victim died as a result of either strangulation or sharp force injuries.

Around midnight two days earlier, on December 1, was the last time the victim's daughter, Pamela Franklin[1], saw her mother. The victim was at home with her daughter and her live-in boyfriend, David Brown. Pamela said the victim mentioned going to a casino that night, left the house by herself, and drove away in her white Chevrolet Lumina. Pamela called the victim several times; however, these calls were not answered. Pamela said the victim and Brown had a couple of arguments in the past, but no physical altercations. Brown remained at the house after the victim left for the casino. Pamela claimed she had never heard of Dorsey.

On cross-examination, Pamela said the victim did not indicate that she was going to the casino with anyone. Despite being confronted with a prior statement in which Pamela told authorities that the victim and Brown had an argument before the victim left for the casino, Pamela maintained at trial that no argument had occurred. Pamela testified that Brown owned several different types of knives and was present at the house when she woke up on the morning of December 1.

David Brown confirmed that he was in a relationship with the victim and lived with her at the time of her death. Brown described his relationship with the victim as "up and down" and claimed that there were no past incidents of physical violence. Brown said he came home from work at approximately 1:30 a.m. on December 1. The victim was at the apartment watching television, planning to go to the casino with her sister, Geraldine. Brown stated that at 1:45 a.m., the victim left the apartment by herself. The victim drove away in her white Chevrolet Lumina. Brown said it was unusual for the victim to leave the apartment so late at night. Brown stayed at the apartment overnight and became concerned when the victim did not return. Brown also attempted to call the victim several times, but he did not receive an answer. Brown knew Dorsey through the victim's sister, Geraldine. Brown said he went to Dorsey's house on two occasions with Geraldine and the victim. Brown was informed that the victim's body had been found on the night of December 3.

Brown acknowledged that he was questioned as a possible suspect. Although Brown was not happy that the victim went to the casino, he denied that he argued with the victim before she left. Brown was questioned about three messages that were left on the victim's voice mail after she exited the apartment. The messages contained profanity and accused the victim of sleeping with other men. Brown threatened the victim in one of the messages. Brown acknowledged that he "probably" left these messages.

Officer Isaac White of the Memphis Police Department testified that on December 2 he was on patrol and responded to a call regarding a suspicious car at the address of 4080

---

[1]For purposes of clarity, we will refer to Pamela Franklin by her first name.

Ponca Street. Officer White said the suspicious car, a Chevrolet Lumina, was parked on a residential street. He identified a photograph of the victim's car, exhibit one, as the car he investigated. Officer White looked inside of the car and "observed a purse and a knife that was bent. Both appeared to have red spots on them that appeared to be blood." He described the knife as a "black handled kitchen knife." Officer White determined that the identification from the purse belonged to a person who had been reported missing. The testimony of Officer White was corroborated by Officer Thomas Ellis, a crime scene investigator for the Memphis Police Department.

Mary Jean Howard, Dorsey's close friend, lived at 4070 Ponca Street. Although Howard could not recall the specific date, she recalled that Dorsey visited her home early one morning sometime before 6:00 a.m. Dorsey did not own a car, and Howard was unsure of how he got to her home. Howard testified that Dorsey stayed with her until later that morning, and she drove him home on her way to work. During Dorsey's visit, Howard noticed something on his shirt. She stated:

> He just had a little something on his shirt and stuff and I asked him what happened and he said well, him and the guy that he went to the casino with that they got into a little misunderstanding and that was it.

Howard testified that Dorsey appeared to have blood on his shirt, and she washed it that same morning. Howard said Dorsey did not have any visible injuries. She stated that Dorsey's behavior during the visit was not out of the ordinary. When Howard was pressed regarding the time Dorsey arrived at her home, she stated "it would have been about two or three o'clock in the morning. I'm guessing now. I don't know. I didn't look at the clock."

Linda Shields lived on the same street as Dorsey and was his "hanging partner[]." Shields received a phone call from Dorsey at around 1:00 a.m. on December 1 in which Dorsey claimed that he had been stabbed by a man in the neck. Shields believed that a woman was also with Dorsey at the time. Shields stated, "I said you been stabbed? And he said yes. The female that he was with had stabbed him. And I said female? He said no I was with a male." Shields told Dorsey to call the police or an ambulance; however, Dorsey refused her advice. He asked Shields to come pick him up, but Shields declined his request. Dorsey then said he was going to call his brother. Shields believed that Dorsey was with a woman on the night of the offense because she could hear a woman's voice while on the phone with Dorsey. Shields stated, "[W]hen he called me and told me had been stabbed, he switched it around and said it was a male."

Shields testified that Dorsey continued to call her on the morning of December 1. He told her to go outside and see if there was a LeSabre in front of his apartment building.

Dorsey also wanted to know whether anyone was standing around his apartment. Dorsey instructed Shields to continue watching over his apartment and to call him if she saw anyone. Later that same day, Shields went to Dorsey's apartment to check on his injury. She described the stab wound as "real deep" and told Dorsey that he needed to go to the hospital. They eventually sat down, started drinking beer, and Dorsey mentioned that Geraldine's sister, the victim, was missing. Dorsey was in a relationship with Geraldine and stated that the victim had been on her way to the casino but never made it. Dorsey denied that he was with the victim that night and claimed he learned this information from the news. Shields told Dorsey that she had not seen anything on the news about the victim. Dorsey then stated that Geraldine told him about the victim.

Shields spoke with Dorsey again at 5:00 or 6:00 p.m. that same day. Dorsey told her that the victim's car had been found on Raines Road. Shields recalled her last conversation with Dorsey that night:

> [T]he last thing he told me that Saturday night, is that they might find the car but it [was] going to take a while for them to find the body. And when they do find the body it will be shredded up so bad that they wouldn't recognize her[.]

When Shields went back to Dorsey's apartment on December 2, he told her that the victim's body had been found. Shields stated:

> [L]ater on that Sunday, that's when he told me they had found her body . . . by a railroad track or something. And I'm going like, Albert, I said you did something to that woman. I said, you're not going to get away with it. And he said, . . . I already done got away with it. And then, later on, he turned around and said, well, the bitch got what she deserved. And it's a whole lot of more bitches going to get what they deserve by talking to me the way they do.

Shields acknowledged that she did not contact the police following her conversations with Dorsey.

Eddie Prewitt, a security guard at Dorsey's apartment building, spoke with Dorsey on the evening of December 1. Dorsey claimed to have been robbed and stabbed by a man who lived across the street. Dorsey showed Prewitt a stab wound on his back, which Prewitt described as being "pretty bad." Dorsey claimed his brother was going to take care of the wound, and told Prewitt that his girlfriend's sister was missing.

On December 2, Dorsey came to Prewitt's office and asked to use his phone. While dialing the phone number, Dorsey explained that the body of his girlfriend's sister was found by railroad tracks. Dorsey described how the sister's face "was messed all up" and how "the knife was on top of the purse in the car with blood on it but no fingerprints." Prewitt said Dorsey called him an hour later and wanted to know how to spell "forensics." Dorsey called again a couple hours later and wanted to know how long it took to perform an autopsy. Prewitt asked Dorsey whether he killed somebody. In response, Dorsey "just kind of like laughed, just said huh . . . and that was it." Prewitt described Dorsey as being "kind of nervous" at the time He testified that Dorsey kept walking up and down the stairs of the apartment building. Prewitt contacted the police because he was bothered by his conversations with Dorsey.

Sergeant Anthony Mullins of the Memphis Police Department's homicide bureau testified that early in the investigation Brown was approached as a possible suspect based on his status as the victim's live-in boyfriend. However, Sergeant Mullins explained the focus of the investigation shifted after two people reportedly overheard Dorsey talking about the homicide. These conversations took place before the victim's body had been discovered by the police. Sergeant Mullins testified that the victim's car was found approximately two miles from the victim's body. Sergeant Mullins said the victim's body was discovered on December 3. He believed news organizations would not have reported the murder until December 4 or 5.

Sergeant Mullins interviewed Dorsey on two occasions. He first interviewed Dorsey on December 6. Although Dorsey admitted that he knew the victim, he denied having seen her for a couple of months. Dorsey admitted that he had discussions on December 1 about the victim's whereabouts and the location of her car. However, Dorsey claimed he learned this information from friends, family, and the news. Sergeant Mullins testified that Dorsey had cuts on his palm, thumb, and neck and described the cut on the palm as "a decent sized laceration." Dorsey claimed these injuries were "construction-related." Dorsey denied having a sexual relationship with the victim.

Sergeant Mullins interviewed Dorsey again later that same afternoon. He confronted Dorsey with information that conflicted with his prior statements. Sergeant Mullins asked Dorsey how he knew information about the murder before the victim was reported missing. Sergeant Mullins stated that Dorsey's demeanor changed and Dorsey "began telling us that his life was over. He said, you know it and I know it. He appeared to be a little more serious, more despondent, maybe." Sergeant Mullins stepped out of the interview room and gave Dorsey a few minutes to collect his thoughts. When the interview reconvened, Dorsey provided a different explanation for what had occurred.

Sergeant Mullins stated:

> [Dorsey] admitted to having seen [the victim] that weekend. He said they were headed to Tunica, going to the casinos, and along the way he said they were accosted, I guess you could say by–he said it was her boyfriend and another male, kind of came along side and forced him to pull off the road and after a physical encounter between those two and him and [the victim], he fled. And ran to Mary Howard's house and that was the last he could tell us about anything that happened to her, her car, anything.

Dorsey acknowledged that he did not contact the police and alleged that the attack occurred somewhere close to where the victim's body was found.

Officer Newton Morgan, a crime scene investigator with the Memphis Police Department, testified that he responded to the crime scene where the victim's body was found. Officer Morgan testified that several items were found around the victim's body: black shoes, panties, a knife, a white baseball cap, a brown glove, a purple robe, a black jacket, a wristwatch, a hammer, and a used condom. The panties were found inside one of the black shoes. Officer Morgan said he collected all of these items and took them to the property room as evidence.

Sean Lester of the Shelby County Medical Examiner's Office also responded to the scene where the victim's body was found. He testified that the victim was partially clothed. and not wearing shoes. Lester described the ground as wet and muddy. The victim's clothes were also wet. Although he expected to see more blood due to the victim's injuries, Lester stated that there was not a significant amount of blood underneath or around the victim. He said it was possible that the blood was washed away by the rain or that the victim was injured at a different location.

Lisa Funte, a medical examiner, testified that she reviewed the victim's autopsy report. Funte stated that the victim's body had two stabs wounds and thirty-seven incised wounds or incised wound complexes. The stab wounds were located to the middle of the chest and to the right buttocks. The incised wounds were found on both hands, the left arm, both legs, the back, the right buttocks, and the abdomen. The victim also had abrasions to the left hip and buttocks region. Funte testified that an internal examination of the neck revealed evidence of strangulation. The victim had numerous abrasions and incised wounds to the head and neck. Funte determined that some of the wounds were inflicted before the victim's death due to the hemorrhaging, blood loss, and "defense type wounds" to the hands and forearms.

Numerous photographs from the autopsy were introduced into evidence and examined by Funte. A photograph of the victim's hooded sweatshirt had defects to the material that corresponded to some of the incised wounds and red discoloration from the blood. A photograph of the clothes found on the victim's body at the scene of the offense. showed the victim's jeans, a black jacket, black shoes, and a torn bra. Funte testified that the autopsy report found no specific evidence of sexual activity. Additionally, there was no definitive evidence that the victim was dragged.

Funte testified that the cause of the victim's death was either strangulation or sharp force injuries and could not state with certainty which of the two types of injury caused the victim's death. A toxicology report showed that the victim was not under the influence of alcohol and drugs. Funte said she expected to see defects to the victim's clothes in the area covering the buttocks. The absence of such defects suggested that this area was not covered when the wounds were inflicted. Funte stated that the victim's vagina and rectum had no signs of blunt force trauma.

Donna Nelson, a forensic scientist for the Tennessee Bureau of Investigation, examined vaginal swabs and rectal swabs that were taken from the victim. The swabs contained sperm that matched Dorsey's deoxyribonucleic acid (DNA) profile. Nelson testified that she examined a knife[2] that had the victim's DNA. She said the condom discovered by the railroad tracks was not tested.

Charity Wright, a records custodian for a cellular phone company, examined the phone records for Dorsey and the victim from December 1. Wright stated that Dorsey called the victim on December 1, 2007 at 12:30 a.m., with the call duration at nearly five minutes. Dorsey called the victim again at 12:46 a.m., with this call duration at one minute and nineteen seconds. Wright testified that Dorsey called the victim five times between 1:01 a.m. and 1:16 a.m.; however, the victim did not answer these calls. Wright said the victim called Dorsey at 1:39 a.m., with the call duration of one minute and thirty-five seconds. Dorsey called the victim at 1:43 a.m. for approximately eleven minutes. Wright said Dorsey called the victim two more times, at 7:30 a.m. and 11:27 a.m. These calls were not answered. Wright testified that the victim called an unidentified number at 3:12 a.m., 5:33 a.m, 5:39 a.m., and 5:41 a.m. Wright said Dorsey and the victim came within range of the same cell phone tower at 1:55 a.m. The radius of a cell phone tower is ten miles.

Following the proof at trial, the jury convicted Dorsey of first degree premeditated murder. Dorsey was ordered to serve a life sentence in the Tennessee Department of

---

[2]It is unclear from the transcript which knife had the victim's DNA.

Correction. The trial court held a hearing to address whether Dorsey would be entitled to the possibility of parole.

**Sentencing Hearing**. Several witnesses testified at the sentencing hearing, including the victim's daughter, Pamela. Pamela explained that the loss of her mother had a significant emotional and financial impact on the family. Miguel Laboy, the medical examiner who performed the autopsy, corroborated the trial testimony of his colleague, Funte. Laboy described in detail how the victim had defensive wounds on her arms and hands. He said defensive wounds are incurred while trying to protect oneself during an attack. Laboy testified that the wounds on the victim's body would have been painful to a person with normal senses. He could not pin-point the exact time in which the victim died and agreed that the cause of death was a combination of strangulation and sharp force injuries.

Jeannette Stanback, an investigator for the Shelby County Public Defender's Office, examined a mental health report from the Memphis City Schools. The report was taken when Dorsey was fifteen years old. Dorsey was forty-nine years old at the time of the hearing. The report showed that Dorsey was a patient at a mental health center. The report stated that Dorsey had an Intelligence Quotient ("IQ") of sixty-five. Dorsey's sister testified that he had been hospitalized in the past for psychiatric problems and was taking medicine for depression and other physical ailments. Dorsey's nephew testified that Dorsey was abused and raped when he was young.

Following the proof at the sentencing hearing, the jury sentenced Dorsey to life without the possibility of parole. The jury found the aggravating circumstance that the murder was especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death.

Dorsey filed a motion for new trial, which was denied. He then filed a timely notice of appeal.

## ANALYSIS

**I. Sufficiency of the Evidence**. Dorsey claims the evidence did not support his conviction for first degree premeditated murder. He argues that the State failed to prove that he killed the victim. Dorsey contends the evidence merely established that he had sex with the victim and that he called her several times that night. In response, the State argues that a rational juror could have found the elements of the offense beyond a reasonable doubt. Upon review, we agree with the State.

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, this court must consider "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support a finding by the trier of fact of guilt beyond a reasonable doubt." The requirement that guilt be found beyond a reasonable doubt is applicable in a case where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977) and Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)). The Tennessee Supreme Court has adopted the United States Supreme Court standard that direct and circumstantial evidence should be treated the same when reviewing the sufficiency of the evidence. See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011). The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and must reconcile all conflicts in the evidence. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996).

When reviewing issues regarding the sufficiency of the evidence, this court shall not "reweigh or reevaluate the evidence." State v. Philpott, 882 S.W.2d 394, 398 (Tenn. Crim. App. 1994) (citing State v. Cabbage, 571 S.W.2d 832, 836 (Tenn. 1978), superseded by statute on other grounds as stated in State v. Barone, 852 S.W.2d 216, 218 (Tenn. 1993)). This court has often stated that "[a] guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." Bland, 958 S.W.2d at 659 (citation omitted). A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citation omitted).

According to Tennessee Code Annotated section 39-13-202(a)(1), first degree murder includes the "premeditated and intentional killing of another." Premeditation is defined, under subsection (d), as follows:

> As used in subdivision (a)(1) "premeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill

-9-

must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

T.C.A. § 39-13-202(d). A person's actions are "intentional" if it is the person's "conscious objective or desire to . . . cause the result." Id. § 39-11-106(a)(18).

The Tennessee Supreme Court has stated that "premeditation may be established by any evidence from which a rational trier of fact may infer that the killing was done 'after the exercise of reflection and judgment' as required by Tennessee Code Annotated section 39-13-202(d)." State v. Davidson, 121 S.W.3d 600, 615 (Tenn. 2003). The Court identified the following factors as supporting a finding of premeditation:

The use of a deadly weapon upon an unarmed victim; the particular cruelty of a killing; the defendant's threats or declarations of intent to kill; the defendant's procurement of a weapon; any preparations to conceal the crime undertaken before the crime is committed; destruction or secretion of evidence of the killing; and a defendant's calmness immediately after a killing.

Id. (citing Bland, 958 S.W.2d at 660). These factors, however, are not exhaustive. Id. The trier of fact may also consider evidence of the defendant's motive and the nature of the killing. State v. Nesbit, 978 S.W.2d 872, 898 (Tenn. 1998).

Here, there was more than sufficient proof adduced at trial which supported Dorsey's conviction for first degree premeditated murder. Most compelling was the testimony of several witnesses who were surprised at Dorsey's knowledge of the details about the murder before the victim had been reported missing and prior to the discovery of her body. Dorsey knew the victim's body was located near railroad tracks, described how the victim's face "was messed all up," and further described how a bloody knife and a purse were in a car. Dorsey told Shields that the victim's body was "shredded up" and unrecognizable and further bragged that he had "already gotten away with it." The language he used to describe the state of the victim's body was eerily consistent with the thirty-seven incisive wounds or wound complexes about the victim's body. Dorsey made all of these comments on December 1 or 2. The victim's body was not found until December 3.

Additionally, Dorsey conceded that he was with the victim on the night of the offense. He acknowledged that he and the victim were in a car together on the way to a casino. A custodian from a phone company testified that Dorsey called the victim numerous times after midnight on December 1. The custodian said there was a phone call at 1:43 a.m. that lasted eleven minutes. After this phone call ended, Dorsey and the victim came within range of the

-10-

same cell phone tower. A forensic scientist from the Tennessee Bureau of Investigation testified that Dorsey's DNA was found on vaginal and rectal swabs taken from the victim. Officer Morgan testified that the victim's body was discovered partially-clothed by railroad tracks. The victim's bra was torn and panties were found in one of her shoes.

The victim's car was discovered two miles from the victim's body at 4080 Ponca Street and Howard, Dorsey's close friend, lived at 4070 Ponca Street. Dorsey admitted that he went to Howard's house in the early morning hours of December 1. Howard testified that Dorsey arrived unannounced at around 2:00 or 3:00 a.m. She said Dorsey appeared to have blood on his shirt. Later that day, both Shields and Prewitt saw Dorsey with a deep stab wound. Dorsey also wanted to know about forensics and how long it took to perform an autopsy.

In regard to premeditation, the forensic scientist described in detail how the victim suffered two stab wounds and thirty-seven incised wounds or incised wound complexes. These wounds were located on nearly every part of the victim's body. Many of these wounds were inflicted while the victim was still alive. The victim had numerous defensive wounds, suggesting that the victim attempted to fight off Dorsey. Evidence was also presented that Dorsey was calm after the killing. Howard testified that Dorsey came to her home around 2:00 or 3:00 a.m. on December 1. She recalled that Dorsey did not act out of the ordinary. Dorsey's remarks to Shields after the killing further demonstrate premeditation. Shields testified that Dorsey said, "I already done got away with it. And then, later on, he turned around and said, well, the bitch got what she deserved. And it's a whole lot of more bitches going to get what they deserve by talking to me the way they do."

Given the above proof, a reasonable juror could have found that after exercising reflection and judgment Dorsey killed the victim beyond a reasonable doubt. Dorsey is not entitled to relief on this issue.

**II. Sentence**. Dorsey argues that the evidence did not support his sentence of life without the possibility of parole. He claims the State failed to prove the aggravating circumstance that "[t]he murder was especially heinous, atrocious, or cruel, in that it involved torture or serious physical abuse beyond that necessary to produce death[.]" T.C.A. § 39-13-204(i)(5). Dorsey sets forth the following argument in his brief:

The problem with the verdict is that the medical examiners were unable to say what caused the death of the victim. They testified that [the victim's] death could have been caused by the wounds that the victim received or by strangulation. Without knowing what was the cause of death, the jury is unable to know what is the aggravating factor.

The State contends the sentence of life without the possibility of parole was supported by the record. The State argues that the aggravating circumstance was met irrespective of whether the medical examiner identified the exact cause of death. Upon review, we agree with the State.

In cases where the State does not seek the death penalty, the following sentencing procedure must be followed:

> In any first degree murder case in which the state does not seek the death penalty but is seeking imprisonment for life without the possibility of parole as the maximum punishment, should the jury find the defendant guilty of first degree murder, the jury shall fix the punishment in a separate sentencing proceeding to determine whether the defendant shall be sentenced to imprisonment for life without the possibility of parole or imprisonment for life. Such sentencing proceeding shall be conducted in accordance with the provisions of § 39-13-204, excluding references to the death penalty.

T.C.A. § 39-13-207(a). If the jury unanimously determines that the State has proven one or more of the statutory aggravating circumstances, the jury shall, in its discretion, sentence the defendant to either imprisonment for life or to imprisonment for life without the possibility of parole. Id. § 39-13-207(c). In exercising its discretion, the jury is required to "weigh and consider the statutory aggravating circumstance or circumstances proven by the state beyond a reasonable doubt and any mitigating circumstance or circumstances." Id. § 39-13-207(d). This court shall determine that a sentence of imprisonment for life without parole is appropriate "if the state proved beyond a reasonable doubt at least one (1) statutory aggravating circumstance contained in § 39-13-204(i), and the sentence was not otherwise imposed arbitrarily, so as to constitute a gross abuse of the jury's discretion." Id. § 39-13-207(g).

Here, the jury found that aggravating circumstance (5) was established under Tennessee Code Annotated section 39-13-204(i). Under this circumstance, the jury considers whether "[t]he murder was especially heinous, atrocious, or cruel, in that it involved torture or serious physical abuse beyond that necessary to produce death[.]" The Tennessee Supreme Court has provided additional guidance in analyzing this aggravating circumstance:

> This Court has previously defined "torture" as "the infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious." State v. Pike, 978 S.W.2d 904, 917 (Tenn. 1998); State v. Williams, 690 S.W.2d 517, 529 (Tenn. 1985). With respect to "serious physical abuse beyond that necessary to produce death," we have previously

-12-

explained that "serious" alludes to a matter of degree, and that physical, rather than mental, abuse must be "beyond that" or more than what is "necessary to produce death." See State v. Nesbit, 978 S.W.2d 872, 887 (Tenn. 1998); Odom, 928 S.W.2d at 26.

State v. Rollins, 188 S.W.3d 553, 572 (Tenn. 2006).

In viewing the record, the State proved beyond a reasonable doubt that aggravating circumstance (5) was applicable. The medical examiner at trial provided extensive testimony regarding the victim's injuries. She said the victim's body had two stabs wounds and thirty-seven incised wounds or incised wound complexes. There were also numerous abrasions and areas of discoloration. These wounds covered almost every part of the victim's body and were inflicted before the victim's death. The victim had defensive wounds on her arms and hands. The medical examiner opined that the victim lost a considerable amount of blood during the attack and concluded that the victim died from sharp force injuries or strangulation. Her testimony was corroborated at the sentencing hearing by the medical examiner who performed the autopsy. The testimony of the two medical examiners provided ample support for the jury's determination that the murder was especially heinous, atrocious, and cruel. The number of wounds, as well as the location of the wounds, shows that the victim endured physical abuse beyond what was necessary to produce her death. Aggravating circumstance (5) was applicable even though the medical examiners could not state whether the victim died from strangulation or sharp force injuries. Dorsey is not entitled to relief on this issue.

**III.  Photographs**.  Dorsey claims the trial court erred by admitting several photographs of the victim at trial and at the sentencing hearing. He asserts that the photographs "were of such a gruesome character that they only served to prejudice and inflame the jury." Dorsey further contends the photographs were inadmissible under Rule 403 of the Tennessee Rules of Evidence because the danger of unfair prejudice substantially outweighed their probative value. In response, the State argues that the trial court did not abuse its discretion by admitting the photographs. The State contends the photographs were particularly relevant because they corroborated the medical examiner's testimony and showed the extent of the victim's injuries. Upon review, we agree with the State.

The trial court has discretion regarding the admissibility of photographs, and a ruling on this issue "will not be overturned on appeal except upon a clear showing of abuse of discretion." State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978). First, a photograph must be "verified and authenticated by a witness with knowledge of the facts" before it can be admitted into evidence. Id. Second, a photograph must be relevant to an issue that the jury must determine before it may be admitted. State v. Vann, 976 S.W.2d 93, 102 (Tenn. 1998)

(citing State v. Stephenson, 878 S.W.2d 530, 542 (Tenn. 1994); Banks, 564 S.W.2d at 951). However, if the photograph's prejudicial effect outweighs its probative value, it should not be admitted. See Tenn. R. Evid. 401 and 403; Banks, 564 S.W.2d at 951. A relevant photograph "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." See Banks, 564 S.W.2d at 951. Unfair prejudice has been defined by the Tennessee Supreme Court as "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily an emotional one." Id. Photographs must never be used "solely to inflame the jury and prejudice them against the defendant." Id.

Dorsey contests the admission of five photographs at trial. These photographs show wounds to the victim's head and neck. One of the photographs was taken at the scene of the offense. The other four photographs were from the autopsy. At trial, defense counsel objected to these photographs based on Rule 403. The trial court overruled the objection, finding that the probative value of the photographs was not substantially outweighed by the danger of unfair prejudice.[3]

Upon our review, there was no abuse of discretion by the admission of the photographs at trial. The probative value of the photographs was considerable in light of how the victim died. Dorsey was linked to the murder by his post-murder conversations with Shields and Prewitt. Dorsey discussed how the victim's body was "shredded up" and unrecognizable. According to Prewitt, Dorsey described how the victim's face "was messed all up." The photographs provided visual evidence of the injuries to the victim's face and neck. They showed that Dorsey had first-hand knowledge of the murder and further corroborated the testimony of the medical examiner. We recognize that the photographs are graphic in nature. In particular, the photograph from the scene of the offense shows a gruesome wound to the victim's neck. The graphic nature of the photographs, however, did not substantially outweigh their probative value. Id. at 950-51 (stating that "photographs of the corpse are admissible in murder prosecutions if they are relevant to the issues on trial, notwithstanding their gruesome and horrifying character" and that exclusion is warranted if the prejudicial effect of the photograph substantially outweighs its probative value). The trial court acted within its discretion by admitting the photographs at trial.

Dorsey also contests the admission of two autopsy photographs at the sentencing hearing. These photographs show gruesome wounds on the victim's head and neck, and are

---

[3]We note that the photographs were not individually labeled when the trial court made its rulings. The trial court did provide a brief description of each photograph. However, we cannot state for certain which photograph corresponds with each of the trial court's findings.

-14-

different than the photographs admitted at trial. Defense counsel objected to these photographs under Rule 403. The trial court overruled the objection, concluding that the relevance of the photographs to aggravating circumstance (5) was not outweighed by their prejudicial effect. We hold that the trial court did not abuse its discretion by admitting these photographs. In sentencing Dorsey, the jury had to consider whether "[t]he murder was especially heinous, atrocious, or cruel, in that it involved torture or serious physical abuse beyond that necessary to produce death[.]" T.C.A. § 39-13-204(i)(5). The injuries shown in the photographs were highly relevant to this determination. Although the photographs were gruesome, they were necessary for the jury to understand the extent of the victim's injuries. Dorsey is not entitled to relief on this issue.

## CONCLUSION

Based on the foregoing, the judgment of the trial court is affirmed.

_____

CAMILLE R. McMULLEN, JUDGE